IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Laurel Flowers,

      Plaintiff,

vs.                                                        No. 1:19-cv-00148 RB-SCY

Matheson Tri-Gas, Inc.,

      Defendant.

## DEFENDANT MATHESON TRI-GAS, INC.'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL REQUEST FOR PRODUCTION 9

      Defendant Matheson Tri-Gas, Inc. hereby opposes Plaintiff's Motion to Compel Request for Production 9 ("Motion to Compel") as follows:

## I.      RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

      Plaintiff was the Site Manager for Matheson's Albuquerque, New Mexico location and was directly supervised by William ("Bill") Cording. *See* [Ex. 1, Transcript of Deposition of L. Flowers at 20:2-13; 45:19-46:2]. Mr. Cording is supervised by Daniel Lambert, who is the Southwest Zone Vice President for Matheson. *See* [Ex. 1 at 78:12-16; 115:17-21].

      Plaintiff brings claims under the New Mexico Human Rights Act ("NMHRA") against Matheson for sex discrimination and retaliatory discharge. *See generally* [Doc. 1-4]. She claims she was required to submit pay equity reports for Matheson under New Mexico's Pay Equity Initiative. *See* [Doc. 1-4 at ¶ 6]. Plaintiff further claims she was terminated "for two reasons: as part of a general pattern of discrimination against women in her position, and in retaliation for her efforts to comply with New Mexico's Pay Equity Initiative by obtaining required pay equity reports[.]" [*Id.* at ¶ 11]. Her termination report reflects her dismissal was for multiple, legitimate business-related reasons, including violating hiring procedures, dishonesty and not following a

ACTIVE 50246317v4

directive from management with respect to pay increases, *improper use of her purchasing card* ("P-Card" or "pay card"), and taking time off without requisite approval.  *See* [Doc 68-1].

In alleged support of her claims, Plaintiff seeks "[a]ll expense reports and American Express statements of expenditures by Daniel Lambert from 2013 to present[]" by way of Request No. 9. *See* [Doc. 68-3].  Matheson objected to Request No. 9 on multiple grounds, including that it "seeks documents neither relevant to the subject matter of this litigation nor reasonably likely to lead to the discovery of admissible evidence[,]" as outlined in its meet and confer correspondence to Plaintiff. *See* [Doc. 68-4].

## II.    ARGUMENTS AND AUTHORITIES

Under Federal Rule of Civil Procedure 26, parties in a federal civil action "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  While "relevancy in the discovery context is broader than in the context of admissibility[,]" this "legal tenet . . . should not be misapplied so as to allow fishing expeditions in discovery." *EmployBridge, LLC v. Riven Rock Staffing, LLC*, No. CV 16-833 WJ/KK, 2016 WL 9281448 at *3 (D.N.M. Dec. 16, 2016) (citations and internal quotations omitted). "Rather, discovery 'is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support.'"  (citations omitted).

### A.  Request No. 9 Seeks Information Regarding Mr. Lambert's American Express Statements; However, Plaintiff Did Not Possess an American Express Card During the Relevant Time Period and Thus, Such Documents Will Not Yield Relevant Evidence.

Plaintiff's termination report provides she was terminated for (among other reasons) "[i]mproper use of *P-Card* and purchases without prior authorization" and thus, any documents regarding *American Express* statements bear no relevance to her claims for sex discrimination and retaliatory discharge.  *See* [Doc. 68-1 at 2].  Indeed, P-Cards (also referred to as "pay cards" or

ACTIVE 50246317v4

"purchasing cards") are different from American Express cards.  *See* [Ex. 1 at 111:3-9 ("Q. … he references two credit cards. Can you explain to me what two credit cards he's referring to? A. There was a green American Express card for travel and entertainment and the – I don't know color of the PCard."); Affidavit of Daniel Lambert at ¶ 2]. Matheson may provide pay cards and/or American Express cards to certain employees depending on their roles and responsibilities and such cards are subject to different policies and procedures.  *See* [Affidavit of Daniel Lambert at ¶ 2.]  Moreover, any documents regarding American Express statements are irrelevant to Plaintiff's matter *because she* did *not possess an American Express card during her employment as a Site Manager*.  *See* [Ex. 1 at 105:9-17 ("A. … I had a green American Express card, … My card was terminated, … Q. When was that? A. Five years ago. Q. Were you a site manager at the time?  A.  No, I was not."); 111:9-10 ("A. … I was not in possession of the green American Express, hadn't been in several years.").]  Rather, during her employment as Site Manager, Plaintiff only had access to a pay card. *See* [Ex. 1 at 103:10-16 ("Q.  Going back to the PCard, when did you first obtain a PCard?  A. … It was within a few years of my employment with Matheson. Q. Did you utilize it in all positions? A. Yes."); 104:10-16 ("Q. … Does this refresh your recollection as to when you first obtained a PCard? A. It was prior to this policy date of 17 April, 2015. Q. So but it was prior to your obtaining the site manager position?  A. Oh, yes.")].

Accordingly, Request No. 9 is nothing but a fishing expedition into financial-related information that in no way concerned Plaintiff while she was a Site Manager and that in no way concerns her claims because she did not possess an American Express card within the relevant time period.

////

### B. Plaintiff and Mr. Lambert Are Not "Similarly Situated" Employees and Thus, Request No. 9 Will Not Yield Admissible "Comparative" Evidence.

Despite that she did not possess an American Express card during her employment as Site Manager with Matheson, Plaintiff's Motion to Compel nonetheless asserts she is privy to documents relating to Mr. Lambert's American Express card to show that Matheson "treated Plaintiff differently than a similarly situated male employee in its application of th[e] purported [pay card] policy." [Doc. 68 at 1]. However, as set further below, Plaintiff and Mr. Lambert are more akin to apples and oranges if anything.

"Employees are 'similarly situated' if they 'deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline.'  Further considerations include 'relevant employment circumstances, such as work history and company policies' applicable to the comparable employees.'" *Sasser v. Salt Lake City Corp.*, 772 F. App'x 651, 663 (10th Cir. 2019) (black employee brought discrimination claims based on race and age under Title VII and the ADEA and the court held his supervisor did not treat him worse than similarly situated white employees) (citations omitted); *see Kelley v. City of Albuquerque*, 542 F.3d 802, 816 (10th Cir. 2008) ("In interpreting [the New Mexico] Human Rights Act, [the New Mexico Supreme Court has] previously indicated that it is appropriate to rely upon federal civil rights adjudication for guidance.") (citations and internal quotations omitted).

Plaintiff and Mr. Lambert are in no way "similarly situated."  First, the Court has already determined that only Site Managers (and not supervisors and executive employees like Daniel Lambert) are employees may be "similarly situated" to Plaintiff  Indeed, in ruling on Matheson's Motion for Protective Order from Plaintiff's Notice of 30(b)(6) Deposition, the Court limited the information Plaintiff may seek *via* Topic No. 1 "as it relates to all *site managers* in  Defendant's

ACTIVE 50246317v4

employ from August 23, 2013 through August 23, 2018[.]"[1]  [Doc. 65 at 5].

Second, Plaintiff's and Mr. Lambert's roles were critically different based on their level of seniority—(as admitted in the Motion to Compel) Mr. Lambert was Plaintiff's "second-level supervisor[.]"  [Doc. 68 at 1].  Courts routinely hold employees (like Mr. Lambert (Southwest Zone Vice President) and Plaintiff (Site Manager)) are not "similarly situated" when one is a supervisor and the other is not.  For example, in *Watts v. City of Norman*, 270 F.3d 1288 (10th Cir. 2001), the plaintiff-employee sued the City of Norman ("city") under Title VII for race discrimination and argued the city's proffered reason for demoting him was pretextual.[2]  He sought to establish pretext through showing that the city treated him differently from a supervisor.  *Id.* at 1293-96.  Given "the difference in their positions of employment," the Tenth Circuit concluded that the plaintiff-employee and the supervisor were not "similarly situated" and ultimately affirmed the district court's entry of summary judgment against him  *Id.* at 1295-97; *see Lofton v. Bank of Am., Nat'l Ass'n*, No. 1:06-CV-3076-ODE-RGV, 2009 WL 10668652 at *8 (N.D. Ga., Feb. 4, 2009), *report and recommendation adopted*, 2009 WL 10669649 (N.D. Ga., Mar. 25, 2009) ("Even accepting as true Lofton's assertion that although Diaz held the job title of teller, he was acting and performing duties as a 'Teller Coordinator' at the time of the October 25, 2005, incident, Lofton also maintains that she was acting as an 'assistant branch manager' at that time and performing those duties, so she remained in a position superior to Diaz.  Thus, under either set of facts, Diaz was not similarly situated to Lofton in all relevant respects."); *Sherman v. Mich. Tube Swager Fabrication, Inc.*, No. 2:05-CV-73361, 2006 WL 2056560 at *6 (E.D. Mich., Jul. 21, 2006) ("Fritz's supervisory role is a fundamental aspect of his employment and makes him a dissimilarly situated individual."); *Monroe v. City of Lawrence, Kan.*, 124 F. Supp. 3d 1097, 1119-20 (D. Kan. 2015) (African-American police

---

[1] Topic No. 1 originally sought information for all employees (not just Site Managers).  *See* [Doc. 65 at 1].

[2] "The NMHRA sets out the same standard for establishing wrongful discrimination as Title VII."  *Benavidez v. Sandia National Laboratories*, 212 F. Supp. 3d 1039, 1065 (D.N.M. 2016).

sergeant was not similarly situated to white nonsupervisory police officers, for purposes of determining whether city and chief of police treated similarly situated employees differently in African-American sergeant's action for discriminatory discharge); *see also Whitfield v. Cato Corp.*, No. CV. 05-755 MCA/WPL, 2006 WL 8444044 at *6, n. 4 (D.N.M., July 27, 2006) ("the Court questions whether Whitfield, as store manager, and Price, as her supervisor, can even be considered similarly situated employees.") (citations omitted).

Third, Plaintiff and Mr. Lambert were not subject to the same policies, including Matheson's Purchasing Card Policies and Procedures – which only pertains to certain personnel and not Southwest Zone Vice Presidents like Mr. Lambert – further rendering them incomparable.[3] *See* [Ex. 2, MATHESON 0108-0114 ("Application for PCards will be limited to the following personal as defined below. Site Managers[;] Plant/ASU Managers[;] Terminal/Distribution Managers[;] Service Techs[;] Field Service Engineers[;] Field Service Managers[.]")]; *see Green v. New Mexico*, 420 F.3d 1189, 1194 (10th Cir. 2005) ("Work histories, *company policies applicable to the plaintiff and the comparator*, and other relevant employment circumstances should be considered when determining whether employees are similarly situated.") (citations omitted). Moreover, and contrary to Plaintiff's assertion, it is of no relevance that personnel like Mr. Lambert *could* have applied for pay card and *could* have been permitted to use a pay card.[4] Such hypothetical is inconsequential because the pay card policy does not suggest that if Mr. Lambert applied for and was permitted to use a pay card, he would be subject to its terms; rather, the pay card policy merely

---

[3] Plaintiff cites *only one* case (*Gossett v. Oklahoma ex rel. Board of Regents for Langston University*, 245 F.3d 117 (10th Cir. 2001) in her Motion to Compel for which she uses to support her proposition that regardless of Mr. Lambert's supervisory role, Request No. 9 will yield admissible comparative evidence because Matheson applied the pay-card policy on a company-wide basis. However, as further set forth below, the pay card policy does not pertain to executive employees like Mr. Lambert.

[4] Mr. Lambert did not apply for a pay card or use a pay card from 2013 to the present—again, precluding any argument that he was subject to the same policies as Plaintiff (let alone that he engaged in the same misconduct as Plaintiff). *See* [Affidavit of Daniel Lambert at ¶¶ 3-4].

provides the "SVP of Logistics and Sourcing[]" could consider his application for a pay card.  *See* [Ex. 2, MATHESON 0108-0114].   In sum, Mr. Lambert was not "similarly situated" to Plaintiff because he was not and was never guaranteed to be held to the same standards, *i.e.* the pay card policy.

Accordingly, given that Plaintiff and Mr. Lambert are not "similarly situated" employees, Request No. 9 (which is simply just a guise for Plaintiff to dig into Matheson's and Mr. Lambert's financial records) will not yield admissible comparative evidence and Matheson should not be compelled to produce such discovery.

### C. Request No. 9 Will Not Yield "Pretextual Evidence" Because It Relies on Plaintiff's Failed Argument that She and Mr. Lambert Are "Similarly Situated" Employees.

In her final effort to persuade the Court that Matheson should be compelled to produce documents relating to Mr. Lambert's pay card, Plaintiff asserts that such evidence will show "that Plaintiff's termination or this reason was pretextual[.]" [Doc. 68 at 1]. But her argument fails because, as set forth above, she and Mr. Lambert are not "similarly situated" employees.

A plaintiff typically makes a showing of pretext in one of three ways:  "(1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff."  *English v. Colo. Dep't of Corr.*, 248 F.3d 1002, 1009 (10th Cir. 2001) (citations omitted).  A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice (as Plaintiff seemingly does here because she does not provide which specific policies or practices Lambert allegedly violated with respect to a pay card) "often does so

by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Id.* (citations omitted).

Plaintiff effectively takes the position that Request No. 9 will show that she was treated differently from Mr. Lambert and thus, her termination (based in part on her improper pay card use) was pretextual. However, and again, Plaintiff and Mr. Lambert are not "similarly situated employees" because he was a supervisor (she was not) and because they were not subject to the same policies and procedures. Accordingly, Plaintiff's "pretextual" based reason for propounding Request No. 9 fails for the reasons specifically addressed above. *See In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018) (to demonstrate pretextual nature of the employer's stated reason for discharging him, in Title VII claim based on differences in manner in which he and co-worker were treated, the dismissed employee had to show that he and his co-worker were "similarly situated" in all respects).

## III.    CONCLUSION

Based on the foregoing, Matheson respectfully requests that this Court deny Plaintiff's Motion to Compel with respect to Request No. 9.

<div style="margin-left: 40%">

Respectfully submitted,

GREENBERG TRAURIG, LLP

*/s/ Lindsay E. Hutner*
Lindsay E. Hutner
4 Embarcadero Center, Suite 3000
San Francisco, CA  94111
Telephone:  (415) 655-1300
Facsimile:  (415) 707-2010
Email:  hutnerl@gtlaw.com
Attorneys for Matheson Tri-Gas, Inc.

</div>

ACTIVE 50246317v4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 6, 2020, I caused to be served via this Court's ECF filing system, a true and correct copy of the foregoing DEFENDANT MATHESON TRI-GAS, INC.'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL REQUEST FOR PRODUCTION 9 on the following counsel of record:

<div align="center">

Andrew Indahl
Altura Law Firm
500 Marquette Drive NW, Suite 1200
Albuquerque, NM  87102
Telephone: 505.841.8400
Email: andy@alturalawfirm.com

</div>

By:____/s/ Lindsay E. Hutner_____
Lindsay E. Hutner

ACTIVE 50246317v4

# EXHIBIT 1

1

1    IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF NEW MEXICO

2

3              No. 1:19-cv-00148 RB-SCY

4    Laurel Flowers,

5              Plaintiff,

6         vs.

7    Matheson Tri-Gas, Inc.,

8              Defendant.

9

10

11

12

13        VIDEOTAPED DEPOSITION OF LAUREL FLOWERS

14              September 18, 2019
                   9:44 a.m.
15        7601 Jefferson, Northeast, Suite 180
                Albuquerque, New Mexico
16

17

18

19        PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE,
     this deposition was:
20

21    TAKEN BY:      LINDSAY E. HUTNER
                     ATTORNEY FOR DEFENDANT
22

23    REPORTED BY:   CHERYL ARREGUIN, RPR
                     New Mexico CCR No. 21
24                   Albuquerque Court Reporting Service, LLC
                     Post Office Box 56787
25                   Albuquerque, New Mexico  87187

20

1   Farmington.

2        Q.    They were site managers?

3        A.    Yes.

4        Q.    Were you all under the same management?

5        A.    No.  I mean, that -- that's a very vague

6   question for -- because management did change over time.

7   However, we were all in the same position.  So when

8   management changed for me, it changed for them, also.

9   So but there were different managers.  Yes.

10       Q.    Were any of them supervised by Bill Cording?

11       A.    Bill Cording was a supervisor of all of us,

12  except -- with the exception of Richard Moku, who was no

13  longer a site manager at that time.

14       Q.    George, can you spell his last name?

15       A.    W-E-N-Z-E-L.

16       Q.    On what basis do you believe Mr. Wenzel was

17  treated better than you?

18       A.    He was making more money than me.  He also was

19  taking the Rail Runner to the store in Santa Fe.

20  Therefore, he was coming in late and leaving early to

21  catch the trains back to Albuquerque.

22       Q.    How do you know Mr. Wenzel was making more

23  money than you?

24       A.    Through discovery.

25       Q.    At the time, were you aware that he was making

45

1       A.    He was already in outside sales.

2       Q.    So he was at Northern New Mexico?

3       A.    Right.  However, all of outside sales reported

4  to Bill Cording.

5       Q.    And what kind of discussions would you have in

6  that time period with Apodaca?  Was it verbal?  Written?

7       A.    More verbal than anything, and I just had

8  normal business conversations with him regarding

9  customers and Matheson business.

10      Q.    Would he discuss Bill Cording with you during

11  these verbal conversations?

12      A.    Yes.

13      Q.    And was this during business hours?

14      A.    Yes.

15      Q.    Would you tell Bill -- Mr. Cording about

16  Mr. Apodaca's concerns?

17      A.    I don't believe I ever did.  No.

18      Q.    And why not?

19      A.    I was not close with Bill Cording and did not

20  have the kind of relationship where I could offer him

21  cautious criticism or critiques on his style of

22  management.

23      Q.    And but he was your manager, correct?

24      A.    Correct.

25      Q.    Was there any manager between you and

Laurel Flowers
9/18/19

Flowers vs. Matheson Tri-Gas, inc.

46

1   Mr. Cording?

2        A.   No.  He was my direct supervisor.

3        Q.   So you didn't feel you had a place to tell

4   Bill Cording that Matheson employees were, you know,

5   unhappy with him?

6        A.   Correct.  The conversations I had with Bill

7   Cording, I would e-mail or ask him to call me, and I

8   would -- was mainly concerned with the things that were

9   of the items that I needed for my store, as far as my

10  business needs were, and I was not acting in -- on the

11  behalf of other employees.  I did not have that

12  relationship with Bill.

13       Q.   But you were a supervisor of employees,

14  correct?

15       A.   I was not Lee Apodaca's supervisor so

16  therefore I did not intervene on his behalf.

17       Q.   Do you know if he spoke with Mr. Wenzel about

18  Bill Cording?

19       A.   If he spoke with -- I don't have any idea.

20       Q.   Have you asked anyone for documents to help

21  you with your lawsuit?

22       A.   Prior to discovery, I asked Wade if he would

23  help me get a copy of the purchasing card policy.

24  However, he was unable, and I -- I did not get any

25  documents from anyone at Matheson.

Albuquerque Court Reporting Service, LLC
(505) 806-1202

78

```
 1              THE VIDEOGRAPHER:  The time is 11:27 a.m.  We
 2          are back on the record.
 3      Q.   (BY MS. HUTNER)  What kind of relationship did
 4  you have with Bill Cording?
 5      A.   Professional.
 6      Q.   Did you like him?
 7      A.   I had no opinion as to whether I liked or
 8  disliked him.
 9      Q.   Did you ever get into any sort of arguments
10  with him or otherwise?
11      A.   No, not that I recall.
12      Q.   Other than Bill Cording, did you have any
13  other supervisors at the time of your termination?
14      A.   Bill Cording's boss was Daniel Lambert, but
15  other than that, no, and I had very little interaction
16  with Daniel Lambert.
17      Q.   So do you have any opinion of Daniel Lambert?
18      A.   We were friends long ago.
19      Q.   Did something happen?
20      A.   Not that I'm aware of.
21      Q.   Did something change?
22      A.   Other than he being promoted to senior
23  management, nothing that I can think of.
24      Q.   Did your relationship kind of go icy or
25  otherwise?
```

**Laurel Flowers**
**9/18/19**                                          **Flowers vs. Matheson Tri-Gas, inc.**

103

1          I know that there were two separate people,

2     Jessica and this other temporary employee, that were

3     providing the service.  Until the other girl quit

4     showing up, and that's when Jessica came on.

5          Because I was told to get the project complete

6     by -- I believe I was given a time frame from Greg or

7     Daniel, and I don't recall if it was by the end of this

8     week or by the end of the month.  But I was given a time

9     frame to get the job completed.

10         Q.   Going back to the PCard, when did you first

11    obtain a PCard?

12         A.   I don't even recall.  It was, oh, 10 or 15 --

13    I mean, it was within a few years of my employment with

14    Matheson.

15         Q.   Did you utilize it in all positions?

16         A.   Yes.

17         Q.   Were you ever trained on appropriate use?

18         A.   Only through written policy.

19         Q.   Did anyone else have access to your PCard?

20         A.   Not that I'm aware of.

21         Q.   So to your knowledge, no one else used it but

22    you?

23         A.   I know there were a few occurrences where I

24    would have a coworker run and purchase something.  I

25    know Larry Pimentel did it specifically with goods for

104

1    resell.  However, I -- I can't think of any other

2    circumstances where someone else used my card.

3         Q.    So going back to the PCard policy, Exhibit 5.

4         A.    Yes.

5         Q.    So bottom of that first page, Rules Eligible

6    for PCard include site managers, plant/ASU managers,

7    terminal/distribution managers, service techs, field

8    service engineers, and then going on, field service

9    managers.

10              Does this refresh your recollection as to when

11   you first obtained a PCard?

12        A.    It was prior to this policy date of 17 April,

13   2015.

14        Q.    So but it was prior to your obtaining the site

15   manager position?

16        A.    Oh, yes.

17        Q.    Per the policy, did you understand that your

18   supervisor was ultimately responsible for your PCard

19   purchases?

20        A.    I knew that my supervisor was in charge of

21   approving my monthly expense report documentation.

22        Q.    Did Greg Leighninger ever discuss with you

23   your PCard use?

24        A.    Yes.

25        Q.    In what manner?

105

1    A.   I know he had me make purchases for him.  I

2  know that -- I don't recall other specifics, but Greg

3  was in charge of signing off on my expense reports for,

4  you know, a long period of time there.  So he was aware

5  of my purchases.

6    Q.   Prior to becoming a site manager, were you

7  ever issued any verbal or written discipline?  About

8  anything.

9    A.   I -- yes.  There was another instance.  I had

10 a green American Express card, and I was written up for

11 using that.  My card was terminated, and I repaid the

12 company for the three charges that were not approved

13 purchases.

14    Q.   When was that?

15    A.   Five years ago.

16    Q.   Were you a site manager at the time?

17    A.   No, I was not.

18    Q.   What were the charges for?

19    A.   I know that there was floral charges, that I

20 had made multiple purchases at one time for floral

21 arrangements, and I do not recall what else.

22    Q.   Were these personal expenses?

23    A.   The floral was, yes.  And I repaid the

24 company, and my card was -- but not -- I've never had

25 fraudulent or accused fraudulent or personal charges on

111

1   appears you do not clearly understand the policy around

2   the usage of these two credit cards."

3                He reference that -- he references two credit

4   cards.

5                Can you explain to me what two credit cards

6   he's referring to?

7        A.   There was a green American Express card for

8   travel and entertainment and the -- I don't know color

9   of the PCard.  I was not in possession of the green

10  American Express, hadn't been in several years.  I only

11  had one card.

12       Q.   So this item we're only referring to the

13  PCard.

14       A.   Correct.

15       Q.   He goes to explain his issues.  The first was,

16  1, "I was told by Daniel Lambert that all meals are T&E

17  and no meals were to be purchased on PCARD (no

18  exceptions MTG employees are required to follow the

19  policy).  I will re-address based on your email from

20  Cindy and supply the team with his response."

21                Did you disagree with this?

22       A.   The policy stated that you could not do T&E on

23  your PCard.  The meals that I purchased were not T&E.

24       Q.   To your understanding.

25       A.   Per historical usage and have -- not having

115

1   signage.  Miscellaneous.

2        Q.    Sorry.  I need a fresh pen.

3              We can stay on the record.  Sorry.

4              And point 4 of this e-mail says "In November

5   you tried to expense a donation to the Boy Scouts of

6   America and expenses for Sam's or Costco membership

7   which the company does not reimburse."  (As read.)

8              Do -- what's he referring to?

9        A.    On my personal expense report on my

10  out-of-pocket expenses, I had done a donation to the Boy

11  Scouts of America for a couple hundred dollars for a

12  tournament that we were involved in as a company.  And

13  also my membership for one of the two of those, I put

14  that on the expense report.  It was rejected.  I removed

15  those expenses and submitted it as is, without those

16  expenses on there.

17       Q.    Who is ZVP, where it says "all donations

18  require ZVP approval"?

19       A.    Zone vice-president.  That would be Daniel

20  Lambert.  And as I did not have his approval prior to

21  making the donation, I did not submit it.

22       Q.    Bill goes on to indicate that he was the one

23  responsible for financials of the region and that's why

24  he's stressing the importance of this, correct?

25       A.    Right.

**Laurel Flowers**
9/18/19                                          Flowers vs. Matheson Tri-Gas, inc.

227

1  regarding obtaining signature of the witness, and

2  corrections, if any, were appended to the original and

3  each copy of the deposition.

4       I FURTHER CERTIFY that the recoverable cost of the

5  original and one copy of the deposition, including

6  exhibits, to LINDSAY E. HUTNER is $         .

7       I FURTHER CERTIFY that I did administer the oath to

8  the witness herein prior to the taking of this

9  deposition; that I did thereafter report in stenographic

10 shorthand the questions and answers set forth herein,

11 and the foregoing is a true and correct transcript of

12 the proceeding had upon the taking of this deposition to

13 the best of my ability.

14      I FURTHER CERTIFY that I am neither employed by nor

15 related to nor contracted with (unless excepted by the

16 rules) any of the parties or attorneys in this case, and

17 that I have no interest whatsoever in the final

18 disposition of this case in any court.

19

20

21         CHERYL ARREGUIN, RPR
           New Mexico CCR No. 21
22         License Expires:  12/31/2019

23

24

25

# EXHIBIT 2

| MATHESON | DOCUMENT TYPE | **POLICY** | **17 Apr 2015** |
|---|---|---|---|
| **ENL-F-001-Y-00 (Rev 03)** | TITLE | **Purchasing Card Policies and Procedures** | **Page 1 of 7** |

The Corporate Purchasing Card (PCard) Program is intended to be an alternative method of payment for the purchase of miscellaneous expenses, materials and services. Type of commodities and services targeted are maintenance and repair items, exhibits (registrations, supplies, etc.), brochures, catalogs and price lists, promotional supplies, and production supplies. The program is intended to improve the expediency and efficiency of these purchases with minimal administrative work.

### USAGE, EXCLUSIONS, ADMINISTRATION, ELIGIBILITY AND SPENDING LIMITES

**EXCLUSIONS**
The following materials and services shall be **excluded** from the Program:

- ➢ Travel and entertainment expenses, including hotel and meals (expense report)
- ➢ Gasoline or monthly cell phone charges (approved cell phone reimbursement must be reimbursed on expense report).
- ➢ Goods and services that become part of inventory for resale (*1).
- ➢ Personal Expenses (*2).
- ➢ All computer components and software.
- ➢ Office Expense (Staples corporate account / direct bill)
- ➢ Subscriptions (expense report)
- ➢ Dues & Memberships (expense report)
- ➢ Any item to be purchased under a CR (Excluded for Cryogenic Services and Application Engineers).

(*1) Retail locations are permitted to charge to the PCard small-scale non-stock items for immediate resale at the specific request of a customer not to exceed $300 per transaction.

(*2) Though the PCard policy restricts any personal expense, if there is a charge that is not validated and is an item used for personal use or consumption, it will be the responsibility of the cardholder and the cardholder's supervisor to ensure reimbursement from the Cardholder to Matheson via a means determined by the PCard Administrator.

**PCARD ADMINISTRATOR**
The **PCard Administrator** is Cindy Elledge, Irving Finance 972-560-5616.

**ROLES ELIGIBLE FOR PCARDS**
Application for PCards will be limited to the following personal as defined below.
Deviation from the below list may only be authorized by SVP of Logistics and Sourcing.

- ➢ Site Managers
- ➢ Plant/ASU Managers
- ➢ Terminal/Distribution Managers
- ➢ Service Techs
- ➢ Field Service Engineers

**MATHESON 0108**

| MATHESON *The Gas Professionals* | DOCUMENT TYPE | **POLICY** | **17 Apr 2015** |
|---|---|---|---|
| **ENL-F-001-Y-00 (Rev 03)** | TITLE | **Purchasing Card Policies and Procedures** | **Page 2 of 7** |

> ➤ Field Service Managers

## NUMBER OF CARDS PER CARDHOLDER

- Each Cardholder may have only one card.  If cardholder is required to buy for multiple locations, spend for multiple locations must be approved by their supervisor and will be assigned in Concur as allowable.

## SPENDING LIMITS

- Cards will be assigned spending limits on both a **per**-transaction and aggregate monthly basis.  Default credit limits are $3,000 per month with $1,000 single transaction.  Limits may be changed based on Management request and approval.

- Cardholders may not divide single purchases into two or more transactions in order to circumvent spending limits.

- Any increases in spending limits must be requested to the PCard Administrator in writing and approved by the SVP of Logistics and Sourcing.

- In the event of special circumstances (e.g. recovery from natural disasters), spending limits may be raised temporarily by request of the approving supervisor with approval of the EVP of Supply Chain Management. Spending limits will revert to normal levels after a pre-determined duration unless an extension is granted by SVP, Logistics and Sourcing.

- Spending habits will be reviewed and used to identify potential purchase agreements. This may include negotiation of discounts on future PCard purchases.

## RESPONSIBILITIES

### GENERAL

- Cardholder acknowledges responsibilities under the Matheson PCard Program and agrees to comply with the requirements set forth by signing the MATHESON Purchasing Card Application / Acknowledgement.

- The PCard is a charge card and must be used in such a manner that ensures the security and safekeeping of the Card. The PCard is nontransferable. Do not give your card or the card number to any other individual to place orders with the supplier. This will result in termination of card privileges. The Cardholder must be the person placing the order with the supplier.

- Advise suppliers of the following at the time of transaction:
  (a)  Apply sales tax to all transactions unless specified as exempt.
  (b)  Invoices are NOT required. Do NOT send a duplicate invoice.
  (c)  The shipping address and person to whom the material is to be delivered.

| MATHESON | DOCUMENT TYPE | **POLICY** | **17 Apr 2015** |
|---|---|---|---|
| **ENL-F-001-Y-00 (Rev 03)** | TITLE | **Purchasing Card Policies and Procedures** | **Page 3 of 7** |

- Obtain a receipt/packing list at the point of receiving goods and verify that the materials and/or services received are what were ordered.

- Backorders should be billed at the time of shipping.

- Resolve all discrepancies with the supplier. Handle returns and credits of goods as separate transactions. They are not to be handled as exchanges or combined with other purchases. DO NOT ACCEPT CASH REFUNDS.

- Review transactions for accuracy and send exceptions to the PCard Administrator.

- Notify a Bank of America Customer Service representative of any billing discrepancies posted on the Monthly Reconciliation Statement that cannot be resolved with the supplier. Bank of America will place these charges in dispute until they are resolved.

- The PCard is the property of Matheson Tri-Gas and should only be used for business purposes. A card used out of compliance with the guidelines established for this program can result in severe consequences, up to and including termination of employment.

## ORDERING MATERIALS AND SERVICES
- Cardholder verifies that the material or service to be purchased is not excluded from the Program. If the item is excluded, or if the cost of the item exceeds the card's spending limit, Cardholder should use the traditional requisition order process.

- Cardholder contacts the supplier and indicates that he/she wants to place an order and pay for it using a PCard. After the Cardholder provides an accurate description of the material or services to be purchased, he/she is to advise the supplier of the following conditions:

  ➢ Apply sales tax to all transactions unless specified as tax exempt and document on all receipts/packing lists, if applicable. Items that are considered tax-exempt are those used in the production process. All other transactions are to be assumed taxable.

  ➢ The shipping address, including the name, and phone number of the person to whom the material is to be delivered.

## RECEIVING MATERIALS OR SERVICES
- The Receiving Department will deliver the containers to the addressee unopened.

- Cardholder verifies that the material or service received is what was ordered and verifies the accuracy of all receipts/packing lists.

**MATHESON 0110**

| MATHESON | DOCUMENT TYPE | **POLICY** | **17 Apr 2015** |
|---|---|---|---|
| **ENL-F-001-Y-00 (Rev 03)** | TITLE | **Purchasing Card Policies and Procedures** | **Page 4 of 7** |

- **RETURNS / CREDITS** Cardholder is responsible for resolving all discrepancies with suppliers. Returns of material to suppliers must be handled as credits and treated as separate transactions. Returns are not to be handled as exchanges or combined with other purchases. A separate transaction must be placed to re-order the correct material.

- Cash refunds are not allowed under any circumstances.

## CARDHOLDERS

- All Cardholders' profiles will be maintained by the PCard Administrator for functional requirements with the Bank of America and Concur.

- Concur will notify the cardholder electronically of charge activity.

- Upon notification of charge activity, cardholder reviews charge(s) and follows Concur guidelines for completing the expense report and uploading of receipts.  If a discrepancy is noted, Cardholder should immediately notify the supplier about the disputed amount or transaction.  All disputed transactions should be resolved through the supplier.

- A "Missing Receipt" form must be completed in lieu of a missing receipt.

- Failure to comply with timely submission of PCard expense will result in suspension of cardholder privileges.

## APPROVING SUPERVISOR'S RESPONSIBILITIES

Cardholder's supervisor is responsible for reviewing and validating cardholder's charges as follows:

- Statements have auto route functionality to the cardholder's supervisor once employee submits statement for review.

- Upon notification from Concur that statement is ready for review, the cardholder's supervisor is responsible to validate and approve that transactions are in compliance with the PCard Policy.  GL coding is to be verified for correctness (Note: Chart of Accounts is included in the Support Form workbook).

- It is the responsibility of the supervisor to approve requests for new cards, related spending limits and location and/or locations approved for purchases under the PCard via a signed "Purchasing Card Application/Acknowledgement Form".

- It is the responsibility of the supervisor to notify the PCard Administrator immediately upon termination of employment or transfer of a Cardholder.

**MATHESON 0111**

| MATHESON | DOCUMENT TYPE | **POLICY** | **17 Apr 2015** |
|---|---|---|---|
| **ENL-F-001-Y-00 (Rev 03)** | TITLE | **Purchasing Card Policies and Procedures** | **Page 5 of 7** |

**PCard ADMINISTRATOR**
- Develop and provide training and maintain communication with cardholders and approving supervisors.

- Responsible for coordinating or arranging training for all new cardholders on the use of Concur automated PCard expense reporting system.

- Maintain cardholder records, Concur Profile and BOA cardholder profiles including: Cardholder names, cost centers, transaction spending limits, monthly spending limits, approving supervisors and card expiration date.   Administrator is to retain monthly history of this information.

- Coordinate Cardholder enrollment, termination and spending limit changes.

**FINANCE – ACCOUNTS PAYABLE DEPARTMENT**
- Receive and process monthly PCard billing statement for payment and input to Matheson Accounts Payable system.

- Finance performs post-audits of PCard transaction activity to ensure proper functioning of the program.

- **The PCard billing system is a single bill/central pay arrangement.**   Payment is centrally executed by Matheson Accounts Payable.  The grand total of all charges to Matheson with supporting detail by Cardholder account is paid to Bank of America directly by Accounts Payable.   Transactions detail by Zone / Area is available for review by zone administration.

- Accounts Payable Manager will assign spending category codes to purchases, as determined by the MMC code attached to each vendor.

- PCard Administrator will have access to review cardholder statements via the BOA web portal.

**SUPPLIERS**
- Mark boxes or other shipping containers with the proper shipping address.
- Show detailed information on quantity, description, & price on receipts/packing lists.
- Apply sales tax to the transaction and record on all receipts/packing lists, as instructed by the Cardholder.
- Do NOT issue invoices.  Bank of America will bill Matheson Tri-Gas direct.
- Segregate individual credit/return transaction.   Do NOT under any circumstances issues cash refunds.

**MATHESON 0112**

| MATHESON | DOCUMENT TYPE | **POLICY** | **17 Apr 2015** |
|---|---|---|---|
| **ENL-F-001-Y-00 (Rev 03)** | TITLE | **Purchasing Card Policies and Procedures** | **Page 6 of 7** |

> ➢ Maintain the confidentiality of the companies PCard account numbers and transaction history to prevent this information from unauthorized use.
> ➢ Backorders should be billed at the time of shipping.

## BANK OF AMERICA

- Process requests for new PCard accounts, and changes to or cancellations of existing accounts in a timely manner.

- Send monthly PCard account statements directly to individual Cardholders as determined by Matheson

- Resolve billing errors with Cardholders and/or Suppliers in a timely manner.

- Provide a single monthly billing statement to Matheson Accounts Payable, including all information necessary to apply transaction costs to the G/L code assigned to each PCard account.

- Provide ongoing customer service through Matheson Tri-Gas representatives; PCard Account person from Bank of America.

## PROCEDURES

## ISSUING A CARDHOLDER ACCOUNT

- Requests for new PCard accounts must be authorized in writing by the prospective Cardholder's approving supervisor.   Requests for new cards must be approved by the SVP, Logistics and Sourcing on the PCard "Application and Acknowledgement' Form (ATTACHMENT A).

- The PCard Administrator, upon receipt of the approved 'Application and Acknowledgement' form will process the request with BOA and will provide the card once received from the bank (with email instruction) to the cardholder.  Upon issuance, Concur will be set-up with the new cardholder's profile and training information on how to use the automated system will follow.

- The Cardholder reviews the Cardholder's Roles and Responsibilities with his/her supervisor, and the approving supervisor instructs the Cardholder of any additional restrictions within his/her department not discussed or identified in this policy

- The Cardholder, approving supervisor and the SVP of Logistics and Sourcing signs the PCard Application/Acknowledgment, and provides the original signed form to the PCard Administrator.

| MATHESON | DOCUMENT TYPE | **POLICY** | **17 Apr 2015** |
|---|---|---|---|
| **ENL-F-001-Y-00 (Rev 03)** | TITLE | **Purchasing Card Policies and Procedures** | Page 7 of 7 |

## CANCELING A CARDHOLDER ACCOUNT

- In the event that the Cardholder is transferred to another location or his/her employment is terminated, the Cardholder's approving supervisor or a designated individual must initiate cancellation of the Cardholder account.  PCard accounts cannot be reassigned from one employee to another.

- Cardholder's approving supervisor or the designated individual should contact the PCard Administrator immediately, then collect the card, cut it in half, then send to the PCard Administrator.   If the plastic card cannot be collected, Cardholder's approving supervisor should advise the PCard Administrator accordingly.

- In the event that the Cardholder's employment is terminated, the Cardholder's approving supervisor or a designated individual should expedite cancellation of the Cardholder account by contacting the PCard Administrator.

- The PCard Administrator coordinates cancellation of the Cardholder account with Bank of America.

- The PCard Administrator will insure the Corporate PCard is collected when the Cardholder is either terminated or resigns.

## LOST AND/OR STOLEN CARD

Cardholder is to report the loss/theft of any card (or account number) immediately to Bank of America Customer Service at 1-888-449-2273.  After Bank of America has been contacted, the Cardholder must advise the approving supervisor and the PCard Administrator.  Upon notification to Bank of America of a lost or stolen card, further use of the card will be blocked.   Prompt action in these circumstances can reduce the Company's liability for fraudulent charges.

**MATHESON 0114**